H. E. DUKE, Appellee, v. CHARLES W. GRAHAM, Appellant.

Agency: ACTION FOR COMMISSION: EVIDENCE. In this action to
1   recover a broker's commission for an exchange of properties, defendant relied upon a collateral agreement additional to the written

contract of exchange procured by plaintiff, which defendant claimed rendered the contract in effect an option, and also pleaded that the party with whom the exchange was to be made was guilty of fraud and deceit in representing the value of his property, and that the contract was of no validity and was mutually rescinded. Oral evidence in support of these issues was received, and it is held that it was for the jury to say whether the contract for commissions was conditional upon a completed exchange, and if so, to find whether the exchange was completed, and if not, to determine whether the failure to complete the deal and abandonment of the exchange was due to the fault or neglect of defendant.

Same:  EVIDENCE:  RES GESTAE.  Evidence as to what was said and done by the parties to a contract for the exchange of property, and as to the reason for abandoning the contract, was admissible as part of the *res gestae,* in an action by a broker for commission in effecting the exchange.

Same:  DEFAULT OF PRINCIPAL.  An owner of property cannot defeat his broker's commission for affecting an exchange of the property by a refusal to enforce the contract of exchange, or voluntarily releasing the other party from his agreement; but he is not required to complete a conditional contract made by the broker, where the other party is in default or is guilty of fraud in procuring the contract.

*Appeal from Wapello District Court.*—HON. F. M. HUNTER, Judge.

FRIDAY, NOVEMBER 14, 1913.

ACTION at law to recover a commission for the sale of real estate. Defendant denied the contract pleaded by plaintiff; alleged another agreement and a failure of plaintiff to comply with the terms thereof. Upon the issues joined, the case was tried to a jury, resulting in a directed verdict for plaintiff, and defendant appeals.—*Reversed.*

*A. W. Enoch,* for appellant.

*Gilmore & Moon* and *F. G. Orelup,* for appellee.

DEEMER, J.—In his petition, plaintiff alleged in substance that at the oral request of defendant he, plaintiff,

undertook to procure a purchaser for defendant's farm, consisting of one hundred and seventy-two acres in Wapello county, or to procure some one who was willing to exchange other property for the farm; that it was agreed between him and the defendant that he, plaintiff, should have as his commission a sum equal to 2 per cent. of the amount "brought by such farm in such sale or exchange," such being the usual and customary commission for services of that nature and a reasonable sum for such services. Plaintiff also alleged that on May 15, 1911, he procured a purchaser who was willing to exchange properties with the defendant, and who did in fact enter into a written contract for the exchange of his farm, the valuation thereon being placed at $23,220, and he asked judgment for the sum of $464.40. Defendant denied the alleged agreement, but admitted that he entered into a written contract of exchange with one Crew for his farm, but averred that the contract was never carried out or fulfilled, and said that the parties did not in fact come to any agreement. He averred that whatever contract he had with plaintiff was conditional upon a completed sale or exchange, and that as a matter of fact no contract of either sale or exchange was ever made or executed. He also averred:

. . . That the written contract between himself and one A. B. Crew was incomplete; that in addition to the same there was a collateral agreement both before and after the same was entered into; that the said stock of goods of the said A. B. Crew referred to in said written contract, including the fixtures, would not amount to more than $10,000, and that before the invoice was completed it was ascertained that the fixtures, which were represented to him to be of the value of not more than $590, amounted to $890, and that the stock of goods would amount to more than $13,000; that all of the statements made with reference to the amount thereof by the said A. B. Crew to the defendant were false and fraudulent, and known to be so by the said A. B. Crew at the time they were made; that said facts were ascertained before said

invoice was completed, and said A. B. Crew voluntarily
rescinded said contract, and admitted that the statements he
made with reference to the value thereof were false and un-
true, and the defendant says that they were made for the
purpose of and intended to deceive and defraud this defend-
ant; that when said facts were so ascertained said contract
was rescinded by the said A. B. Crew, and held for naught;
that all of the said facts and circumstances as recited herein
were known to the said H. E. Duke, who then afterwards
traded said stock of goods to one Andrew Lames, as he is
informed.

By operation of law the affirmative defenses pleaded in
the answer were denied. Such were the issues upon which
the case was tried, and at the conclusion of all the testimony
the trial court directed a verdict for the plaintiff in the amount
claimed by him.

The appeal is from this ruling, and it is contended for
appellant that the trial court was in error in not submitting
the issues, or some of them, made by the pleadings to a jury.

1. AGENCY: action
for commis-
sion : evidence.

That the exact propositions argued may be
fully understood, we here quote from appel-
lant's brief, as follows:

There are four propositions in this case, all of which
should have been submitted to the jury, viz.: Whether or not
an enforceable contract was obtained by the plaintiff and on
the terms prescribed by the agent's principal. Second.
Whether or not a contemporaneous oral agreement and col-
lateral oral contract, made both before and after the written
contract was entered into, should have been construed alto-
gether as one and the same transaction. Third. Whether or
not an oral contract between the plaintiff and defendant for
commission was not conditional and dependent upon an actual
exchange of property between the contracting parties, to wit,
A. B. Crew and Charles W. Graham, before it was a completed
sale or exchange. Fourth. Whether or not defendant was to
have 2 per cent. commission or $1 an acre, or whether the
plaintiff and defendant ever came to any agreement as to
what the commission was to be.

In order to solve these propositions, or some of them, it is necessary to recite the facts, and these must be in the form most favorable to defendant. Plaintiff is a real estate agent, residing in Ottumwa, Iowa, and one Dewey Smith was also a real estate agent, doing business at the same place, and in the transaction here in question acted for the purchaser, or the supposed purchaser, Crew. Plaintiff, defendant, and Smith went to Richland, Iowa, where Crew resided and had a stock of general merchandise, which he was willing to trade for lands. While negotiations were in progress, plaintiff said something about a commission if a trade was made, and defendant asked plaintiff how much it would be, to which plaintiff responded 2 per cent. Defendant remarked that this was too much; but plaintiff said, ''I made a good deal, and I put the land in at $135 per acre, and you will have to pay me 2 per cent;'' and defendant then said, ''Well, I will have to pay.'' This, according to the testimony, was just before a written contract between defendant and Crew was drawn up, and it is also shown that defendant, although complaining of the amount of the commission, finally said, before the contract was drawn, ''All right, go ahead.'' Defendant himself said on the witness stand that he told plaintiff, after plaintiff stated his terms, there would be no quarrel about the commission if the deal was completed. As a matter of fact, a written contract of exchange was entered into and signed by defendant and Crew, which, among other things, provided:

I, A. B. Crew, party of the first part, hereby agree to trade to Charley Graham, second party, my brick dwelling and store building, also the entire stock of merchandise and fixtures now contained in said store, and being the only stock of merchandise and fixtures and buildings owned by A. B. Crew in Richland.

Second party agrees to take the buildings at the price of $10,000.00. He also agrees to take the merchandise at invoice price, and if the buildings and stock of merchandise run over the amount of the equity in a certain farm owned

by Charley Graham, and hereinafter described, then Charley Graham agrees to pay A. B. Crew, first party, seventy-five cents on the dollar for such amount of merchandise as may be shown by the invoice to be in excess of the above-mentioned equity.

Charley Graham hereby agrees to trade to A. B. Crew 172 acres of land, more or less, situated in Wapello county, Highland township, and being the land shown A. B. Crew on May 15, 1911, in company with H. E. Duke, C. W. Graham, and D. D. Smith.

Said A. B. Crew takes the above-described farm at $135 per acre, and, as there is a certain mortgage of $5,000 now on said land, A. B. Crew hereby agrees to assume same. This mortgage runs for about five years, with interest at 6. per cent., payable annually. A. B. Crew agrees to assume payment of interest on said mortgage from November 22, 1910.

And it is further agreed that Charley Graham shall have possession of buildings and merchandise described as soon as the necessary papers of exchange can be made out and exchanged, which shall be within the next nine days, or not later than May 24, 1911.

It is also mutually agreed that a good and sufficient warranty deed and abstract of title shall be furnished by each party, showing the respective properties to be free and clear of all liens and incumbrances whatsoever, except mortgage herein mentioned now on farm.

It is agreed that all bills for stock of merchandise be produced by A. B. Crew, and become the basis for invoice of stock.

It is understood that the second story of storeroom in this deal does not become a part of this deal, as it is owned by a society known as the Odd Fellows; also the stairway leading to second story is exempt.

It is also agreed that, in case A. B. Crew cannot produce each and every one of the bills showing cost price of merchandise, then each, the first and second parties to this deal, shall select one individual each to establish a price on such goods or merchandise.

The above proviso is conditional on first and second parties not being able to agree between themselves.

In case the invoice of stock of merchandise in this deal shall exceed the equity in the farm in this deal, then Charley

Graham, second party, shall give A. B. Crew, first party, a note for such amount, without interest, for six months.

It is also agreed that, in the event of the stock of merchandise falling short of the equity of farm in this deal, then A. B. Crew, first party, shall pay to Charley Graham, second party, such amount of cash as the shortage may show.

This contract seems full and complete in itself, and, were this all of the case, it is manifest that plaintiff would be entitled to his commission. But, as already stated, defendant relies upon a collateral agreement which he claims made the contract in effect an option, and further contends that Crew was guilty of such fraud and deceit in representing the value of his merchandise, that the contract was of no validity, and that because of that fact it was voluntarily rescinded by both parties, and never became operative. Oral testimony was taken on these issues, and plaintiff at no time attacked the defendant's pleading, nor is he now in position to assert that the court was in error in receiving the oral testimony offered regarding the nature of the contract.

The defendant's version of his contract with plaintiff was that he would pay the commission if the trade went through; but plaintiff claims there were no limitations upon the promise, and that he did all that was required of him to earn his commission. It was for a jury to say just what the contract was, and, if it found it to be as defendant testified, then it became important for the jury to find whether or not the trade did go through, and if it did not whether or not failure to close the deal was due to defendant's fault. It seems that the trade was in fact abandoned, and one of the principal questions is, Was this due to defendant's fault or neglect? This, we think, under the record before us, was a matter for the jury.

Defendant, among other things, testified that it was represented to him by Crew that the stock and fixtures would not invoice above $10,000, and that he (defendant) said:

The first thing I asked about of Mr. Crew, I said, 'What will these fixtures amount to?' He said they wouldn't go over $600, and then he said later on, 'Let me see; I can tell in a minute.' He looked around the store, and came back, and said, '$590.' 'Well, now,' I said, 'Mr. Crew, if these fixtures and stock run as high as $10,000, I don't want to touch it.' I said, 'I will not touch it.' He said, 'It will not go to $10,-000.' He said, 'I know that.' He said, 'Do you suppose, if this would go as high as $10,000, I would let you have the rest of these goods at 75 cents on the dollar?' He said it might go a little over $8,000; it might go a little under. He didn't say he thought; he said, 'I know.' 'Well,' I said, 'I guess I am ready to trade.'

After testifying about starting with the invoicing of the goods, he further said:

Q. What did Mr. Crew say there about there being more goods there than he told you there was? A. He said, 'There is more than I said the fixtures was.' Q. Now, then, in that conversation, state what occurred after that. A. I said, 'Mr. Crew, will your goods—are they going to run about what you said they was? Will they run about the same as the fixtures has?' 'Well,' he said, 'there are more goods here than I thought there was.' Q. Go ahead, and state what was said and done. A. 'Well, then,' I said, 'Mr. Crew, do you know how much goods are here?' 'Well,' he said, 'I don't know.' He said, 'I been away a good deal, and Julius had been running the store; I will have quite a lot more goods here than I thought.' There was a great deal more, and I said, 'Mr. Crew, don't you know I told you at the time we made the trade that I could not raise money to pay for any more goods than what I said, and that it would have to come under $10,000?' Q. Go ahead. A. 'Well,' Mr. Crew said, 'if you think you cannot handle it, all of the goods,' he said, 'you need not take them;' and I said, 'Mr. Crew, can't you show me, so we can know how much goods there are?' I said, 'I want to know this before we quit.' He said, 'I cannot get hold of the old invoice books, but we can figure it up together; you can tell as well as I can.' He said, 'I have got a list of the latest invoices, and I have got a record of all the goods that were sold, and we can figure that up together, and see

where we will land;' and he got his book, and we figured it up.

Cross-examination for the plaintiff:

Q. Did you figure up the invoice book, or did Mr. Crew? A. We both figured it up—both of us together. Q. You saw it figured up, did you? A. Yes, sir. Q. Did Mr. Crew tell you how much there was? A. Yes, sir. Q. How much did he say there was— Did you see the figures that showed what the invoices amounted to? You have already testified that you did, haven't you? A. I cannot say that I saw all of them. Mr. Crew would call some of these figures. Q. Then what would you do? A. I would set them down. Q. You added the figures up to see what they amounted to? A. Yes; Mr. Crew did also. Q. And you did? A. Yes, sir.

Redirect examination:

Q. How much did he say it amounted to? A. I cannot tell the exact figures; but it was between $12,000 and $13,000. Q. Now, what, if any, conversation took place directly after that about the stock? What, if anything, did you say to him, now that you were ready to take it on the statement he had made, if it didn't go over $9,000? A. I said to Mr. Crew, 'If your stock of goods will not go to $10,000, as you have said, I would not have said anything about it;' but I said I could not if I wanted to. I could not pay for all of these goods. I said, 'I claim this;' these are the words I said about misrepresenting the goods; I told Mr. Crew, 'I claim this stock of goods has been misrepresented to me by Mr. Duke, by Mr. Smith, and by you.' Q. What did he say to that? A. Well, he said, 'I know there is more goods, but I was mistaken about it.' Q. Did he use the word 'misrepresent'? A. Well, not at that time; no. Q. Well, now, what else did he say to you, what other conversation did you have? A. Well, we talked it over for a while. He said, 'I don't want any trouble with this thing.' He said, 'If you think you can't take all of the goods that are here,' he said, 'I am willing to drop the thing, and call it off right here.' Q. Then what did you say to him? A. Well, I said, 'If you are sure now this is right, and I want you to be sure.' Q. What did he say? A. Well, he said, 'I am positive.' I said, 'I will go on with the invoice if

you say so, so we will know;' and he said he would rather not do so if the deal is not going through. He said he would rather not invoice, if I could not take all of the goods, he would rather not invoice, and he said, 'If it satisfies you, if you are willing, I will just call the deal off.' Q. Then what did you say, if anything, at that time—that you were willing to go to the amount of $8,000 or $9,000, what you stated you would do? Just state what was said; what further conversation did you have? A. I didn't have much further conversation. I said, 'All right, I am satisfied.' Q. Well, now, did you have any further conversation after that with him about it, or was that the last conversation? A. Yes; we had quite a talk. We visited awhile after that, a little while. Don't remember that he used the word 'misrepresented' in regard to himself; but then in regard to agents he said it. Q. You, you made a statement about Mr. Duke and you agreeing to this commission. Now you may just state the conditions upon which that commission was to be paid, what you said to him, what was said by either of you, and when you claim that conversation took place. A. Well, we went out on the sidewalk in front of one of those stores; went out in front on the sidewalk in front of the automobile, but I can't remember which one mentioned the commission first; but I said—I know I asked him how much the commission was, how much he expected if we made the deal. He said 2 per cent. I said, 'You surely don't want 2 per cent. on all the wind you put into the price of that farm, do you?' and he said, 'Yes, I do.' I said, 'You never charged me more than a dollar an acre before for selling a farm.' 'Well,' he said, 'I want 2 per cent. or $432.20; that is what I want.' 'Well,' I said, 'We have not got time to quarrel about that; if we complete the deal, we will not quarrel about the commission.'' That is the very words I used—'If we complete the deal, we will not quarrel about the commission'—but we never did.

Other witnesses corroborated the defendant in greater or lesser degree, and it seems to us that, eliminating the question of fraud altogether, there was enough to take the case to the jury upon the nature of the contract with plaintiff, and the performance thereof by him. The testimony as to what was said and done at the time of the invoice, and as to the reason for the aban-

2. Same: evidence: *res gestae.*

donment of the contract, was part of the *res gestæ* of the transaction between defendant and Crew; that is to say, it showed verbal acts explanatory of the situation, and was to the effect that no trade was in fact consummated or completed.

Of course, the owner of land cannot defeat a broker of his commission by refusing to enforce his contract against the buyer, or by voluntarily releasing the buyer from the obliga-

3. SAME: default of principal. tions of his agreement. *Lunney v. Healey,* 56 Neb. 313 (76 N. W. 558, 44 L. R. A. 593); *Ward v. Cobb,* 148 Mass. 518 (20 N. E. 174, 12 Am. St. Rep. 587). But he is not required to complete a conditional contract made for his benefit, where the buyer fails to meet the conditions imposed upon him, or where the buyer is guilty of fraud in procuring the same.

The case differs essentially from *Nagl v. Small,* 159 Iowa, 387, and other like precedents, in that in those cases there was no question about a binding and enforceable contract having been entered into, and there was no agreement between the owner and his broker that the broker should have a commission only in the event the trade went through. Here there was evidence of that kind, and proper and competent testimony to the effect that defendant was justified in not carrying out the trade. He was not, under the testimony, bound by the contract or compelled to carry it out in the event the stock and fixtures invoiced more than $10,000, and he should not be held to pay a commission if that testimony be true, because he refused to take a stock invoicing $2,000 or $3,000 more than it was estimated, and pay therefor in cash even at a large discount.

The parol testimony as to the nature of the exchange was, as we think, competent. As the evidence was directed to the value of the goods and to the reasons for the failure to complete the exchange, it was entirely relevant and competent.

We think the case should have gone to the jury. It follows that the judgment must be and it is *Reversed.*

WEAVER, C. J., and GAYNOR and WITHROW, JJ., concurring.